UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| | ) | | |
| v. | ) | No. 3:17-00092 | |
| | ) | JUDGE TRAUGER | |
| | ) | | |
| TAD ERIC CUMMINS | ) | | |

**TAD CUMMINS' SENTENCING MEMORANDUM**

Tad Cummins, through counsel, files the instant sentencing memorandum in support of a sentence of 120 months to serve. Mr. Cummins submits that the advisory guidelines range is an effective life sentence, or a sentence of prison death, which is far "greater than necessary" to satisfy the objectives of sentencing set forth in 18 U.S.C. § 3553(a).

**I.      INTRODUCTION**

Tad Cummins stands before this Honorable Court full of shame and pain. Not a day goes by that he does not mentally torment himself over the pain that his actions have caused others. He has come forward under intense shame, embarrassment, and remorse to accept responsibility for his actions.

## II.    ARGUMENT

This Honorable Court has the tremendous task of determining the most

appropriate sentence in this case. During his tenure as a Circuit Judge, current Supreme

Court Justice Neil Gorsuch discussed the job at hand:

> Sentencing someone to prison has to be one of the district judge's toughest tasks.  So much is at stake for the defendant, the victim, and the community.  So much responsibility rests on the judge's shoulders, along with the high expectations that the judge will wisely weigh things that cannot be easily weighed.  How much punishment is enough to protect the public?  To deter future wrongdoing?  To reflect the gravity of the offense?  And how much punishment suffices to accomplish all of these things without verging on cold revenge or needless retribution?  There's rarely a single right answer to hard questions like these. So our system depends, as perhaps it must, on the discretion of thoughtful judges.  One tool district judges have to help them in their unenviable task is the advisory sentencing guidelines.  The guidelines seek to supply some sense of what other courts across the country are doing in similar cases and what sentencing experts think may be appropriate. [citations omitted].  Of course, each defendant must be assessed on his or her terms: courts are not machine presses and sentences are not widgets to be churned out on some criminal justice conveyor belt.

*United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014)
(emphasis added).

Under the landmark decision of *United States v. Booker*, the Sentencing Guidelines

are no longer binding on the court. 543 U.S. 220 (2005). Instead, the court must look to

the multiple factors outlined in 18 U.S.C. § 3553(a) and impose a sentence that is

2

"sufficient but not greater than necessary" to achieve the four purposes of sentencing – justice, deterrence, incapacitation, and rehabilitation. *United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006). In imposing a sentence, the court must consider *all* of the factors set forth in § 3553(a)(1)-(7). *Id.* (explaining that court should consider Guideline range as one factor in the mix of seven factors under § 3553(a)). While these seven factors include the applicable sentencing range and the Commission's policy statements, including departures, the other factors play an equal role under the statutory scheme. *See* 18 U.S.C. § 3553(a)(1)-(7); *United States v. McBride*, 434 F. 3d 470, 475-76 (explaining that guidelines are just one of the numerous factors that sentencing court must consider). These additional factors include the "nature and circumstances of the offense," the "history and characteristics of the offender," and the "kind of sentences available." *See* 18 U.S.C. § 3553(a)(1), (7).

At bottom, the sentencing court "may not presume that the [g]uidelines range is reasonable," *Gall v. United States*, 552 U.S. 38, 50 (2007), and cannot "require 'extraordinary' circumstances to justify a sentence outside the guidelines range." *United States v. Bolds*, 511 F.3d 568, 580-81 (6th Cir. 2007). The district judge "must [instead] make an individualized assessment based on the facts presented and upon a thorough consideration of all of the § 3553(a) factors." *Id*. at 580 (quoting *Gall*, 552 U.S. at 50). Although the Sentencing Commission "fills an important institutional role" in promulgating the guidelines, the sentencing judge "has greater familiarity with the

3

individual case and the individual defendant before him . . . [and] is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular case." *Kimbrough*, 552 U.S. at 109 (internal quotations and citations omitted).

Tad Cummins asks this Honorable Court to consider his life of productivity, service, and other good character that he has exhibited outside of this instant offense. Furthermore, his age, decreased likelihood of recidivism, and the fact that this was an isolated event, allow the Court to engage in an individualized analysis and enter a sentence of 120 months in prison. The Guidelines and recommendations to this Court amount to an effective life sentence, wherein he will almost assuredly die in prison.

## III.    Sentencing Factors

### A.    The Nature of The Offense

Tad Cummins acknowledges that his actions have caused so much pain to M.T., his family, and his former wife. What began as his sincere efforts to help a student in need, spiraled out of control beyond his character, his faith, and logic. Tad Cummins had prided himself on being the type of teacher who was always willing to listen to students, offer sound advice, and motivate them to excel. He enjoyed teaching students about the medical profession.

When Tad Cummins met M.T. he realized that she was going through difficulty at school and home. The more he listened, the more concerned he became. Through social media and direct conversations Tad Cummins became aware that M.T. was

4

having difficulty adjusting to school. Tad Cummins would describe her home situation as worse than some of the others he had mentored. She also explained how frustrated she was being let down by others when she needed them most. Tad Cummins both sincerely and arrogantly thought that he would be the one to protect her. In his desire to help her, he became emotionally invested and lost true sight of ways in which he could help her the most.

For a period of time, they would talk almost every single day. Tad Cummins found that he enjoyed the conversation. He also realized that his role had transformed from teacher to a father figure. Tad Cummins believed he was showing the support she seemed to desperately need. He also believed that by taking her to church, he could help her deal with her troubles on a spiritual level. Even at that time, Tad Cummins did not realize that his role was beginning to take a turn for the worse.

As the two increased their daily interaction, an attraction emerged. Looking back, Tad Cummins realizes how stupid he was to even continue their relationship in any form the moment he realized the slightest possibility of attraction between the two. Instead, he allowed the interactions to persist. One day, the unimaginable happened; they kissed. Tad Cummins had in an instant betrayed his wife, his faith, and his responsibility to M.T. as a student. To his horror, he allowed it to go further. He admits that both in and out of school, he engaged in oral and other sexual activity with M.T.

As one can imagine, the shame and embarrassment would be immense for both of them. Cullokea was a small community, and this would be the talk of the town. Against reason, they continued to communicate with each other. When M.T. said she was running away, Tad Cummins wrongly insisted to go with her. True to their plan, he picked her up at Shoney's, and the two left the state.

Tad Cummins admits that he was foolish in thinking that the two would get married. He even looked up states in which a marriage between the two would be legal. During the course of the trip, they acted as if they were married. Tad Cummins admits that this also involved sex on multiple occasions. For that he is remorseful. From the depths of his heart he acknowledges the pain he has caused M.T. and offers his most undeserving apology.

**B.    Tad Cummins' History and Characteristics**

**1.  Family Support**

Tad Cummins grew up in a tight knit family with strong Christian values. Raised by both parents, Tad and his sister enjoyed a home where all of their needs were met. He readily admits that he was privileged to be raised in such a secure, loving environment. When asked about people he looks up to, Tad immediately refers to his father as his hero and his mother as a source of love. Both parents raised him with love and respect for the law. He wants his parents to know how much he loves them and

6

how disappointed he is in himself to have betrayed the sound Christian principles that they instilled in him.

According to Tad Cummins, his greatest achievement was co-raising his two amazing daughters. Tad placed the responsibility of fatherhood squarely on his shoulders. He made his daughters his number one priority, and focused on being supportive, loving, and present for all of their needs. Tad Cummins' daughter Erica Osborne, describes him as her "greatest supporter." She explains that in the most difficult of times, he was there with comforting words of support. Erica also reveals the principles that he taught her and her sister. She explains that while "growing up he also was so big on teaching us never to lie no matter the consequences the truth may bring." (See Exhibit 1a) He taught them that even the small lies have consequences and often balloon in to larger, more serious lies. In this case, Tad Cummins breached one of the very principles he taught his children. He lied to his then wife, family, community, and initially to law enforcement. However, he has since stepped forward to admit the truth. He began by admitting his conduct to law enforcement, his family, and eventually the world when he pleaded guilty to the charges against him.

While his parents, sister, and daughters, remain supportive of Tad, they want the Court to know that in no way do they condone his behavior with M.T. All of them were shocked and horrified at this episode. To this day, his family struggles to understand how the son, brother, and father they knew could make such a tragic decision. While

they are deeply hurt by his actions, Tad's family plans to continue showing support for the man they knew, and the man that they believe he can once again become.

"The single best predictor of successful release from prison is whether the former inmate has a family relationship to which he can return. Studies have shown that prisoners who maintain family ties during imprisonment are less likely to violate parole or commit future crimes after their release than prisoners without such ties." Solangel Maldonado, Recidivism and Parental Engagement, 40 Family L. Q. 191, 196-197 (2006).

Tad Cummins knows how lucky he is to have family support him throughout this ordeal. Upon release, he plans to again focus on being there for his daughters and grandchildren. He thanks God that they remain supportive of him.

### 2. Education, Employment, and Service to Others

Tad Cummins graduated from Mt. Pleasant High School in 1985. A former teacher describes him as "an excellent student, never a problem, an ideal student. He was polite, kind and motivated." (Exhibit 1b Kittrell Letter) While in high school, Tad Cummins was heavily involved in band. The band was competitive both within the state and regionally. His former band captain describes Tad Cummins as "an integral part of the band's success. When I think of him, the words responsible, reliable, and kind come to mind. He felt an obligation to everyone in the band." During this time, Tad Cummins made himself available to help others in the band. (Exhibit 1c Carpenter Letter)

After graduating high school, Tad Cummins enrolled in Columbia State Community College. He wanted to enter a field wherein he could be of value to the community. There he earned an Associate of Applied Science degree with a major in respiratory care. For the next two decades, Tad Cummins worked for various medical companies as a respiratory specialist. For years he worked with the knowledge and skillset needed for Pediatric Advanced Life Support.

In addition to his job as a respiratory therapist, Tad Cummins was also a CPR instructor. This experience pushed him to go into the education field so that he could train and inspire others to go forward in the medical field. In 2011, Tad Cummins accepted a position as a teacher at Culleoka School. He hoped to inspire and mentor students. In fact he, was the advisor of HOSA: Future Health Professionals. Through HOSA, he introduced students to the health profession and encouraged them to consider a future in the medical profession.

One former student, who requested to remain anonymous, describes him as a "very caring and intelligent Christian man. He was always there to listen if anyone needed someone to talk to…The three years I spent with him taught me not only health field related values but how to open my heart and become a better person. Tad always encouraged us to help one another." Even after graduation Tad Cummins was always there to help. This same student reached out to him after graduation to seek advice on how to enter the medical field. She states, "if it wasn't for Tad I wouldn't have found

the career I love. Thanks to him I pursued this and became a registered respiratory therapist." (Exhibit 1d student letter).

Tad Cummins also used his education and training for the benefit of others outside of a hospital setting. Family and friends have known him to routinely stop at car wrecks and other accidents to offer his assistance. He also went on a Mission trip to Panama. While there, Tad Cummins assisted a nurse practitioner. Together, the two would do their best to address various medical issues. Although his background was in respiratory therapy, he was able to assist with other general medical issues. For Tad Cummins this was more than helping others. The experience opened his eyes to the poverty and pain of others less fortunate. This fueled his passion for the medical field and inspired him to be the best respiratory technician he could be. He intensified his training, and vowed to help as many as he could. Tad also volunteered during the Hurricane Katrina disaster. He went to New Orleans for a week and offered his assistance in both health and general labor. Despite the instant offense, Tad Cummins has used his skills to help others in the community.

Similarly, his family relayed two other instances of his desire to help others. In 2003, the NHC Nursing Home in Nashville caught fire. The damage was enormous. Numbers of patients lost their lives. Mr. Cummins happened to be on the scene when the fire erupted and was on the ground helping until the first responders showed up. On another occasion, he witnessed a purse -snatching at Kroger. Unarmed, Tad

10

Cummins and security chased the assailant and detained him until law enforcement arrived.

### 3. First Time Being In Trouble

A defendant's first offender status is a powerful predictor of the likelihood of recidivism. Indeed, the Sentencing Commission has itself recognized that first-time offenders are even less likely to re-offend than defendants with a limited criminal history who also fall within Criminal History Category I. *See* U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First Offender Report*]. The Commission's research has, for example, demonstrated that offenders with zero criminal history points have a recidivism rate of just 11.7%, while offenders with just one criminal history point have double the recidivism rate at 22.6%. *First Offender Report* at 13-14. Though the Commission has long recognized the advisability of revising the Guidelines to take first-offender status into account, it has taken no action towards making such revisions. *See First Offender Report* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure).

In response to the Commission's inaction, a growing number of courts have themselves taken first-offender status into account when fashioning an appropriate sentence under 18 U.S.C. § 3553(a). *See, e.g., United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding sentence in child pornography case as reasonable where

district court granted downward variance on basis of defendant's first-offender status); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants, like Cabrera, "with zero criminal history points are less likely to recidivate than all other offenders). Other courts have expressed similar reasons for this variance. *See United States v. Smith* (4th Cir. April 23, 2008), 2008 WL 1816564 (unpub.) (in child porn case where guidelines 78-97 months, a sentence of 24 months is not an abuse of discretion where district court noted defendant was 64 years of age and had avoided violations of the law "up until this point in his life"; *United States v. Hanson* 561 F. Supp. 2d 1004 (E.D. Wisc. 2008) (in possession of child porn case where guidelines 210-262 months, court imposes sentence of 72 months in part because he was 49 years of age and "had no prior record whatsoever" and "he had never before been to jail for even one day"); *U.S. v. Ward*, 814 F.Supp. 23 (E.D.Va. 1993) (departure warranted because guidelines fail to consider length of time defendant refrains from commission of first crime, here until age 49).

Mr. Cummins is 52 years old with absolutely no criminal history. Other than the instant offense, Mr. Cummins has led his entire life as a law abiding citizen. A sentence of 120 months is certainly "sufficient, but not greater than necessary" to achieve the deterrence and other goals of sentencing set forth in 18 U.S.C. § 3553(a).

### 4. Collateral Punishment

Due to his own actions, Tad Cummins has lost almost everything. For him, losing his wife is the equivalent of losing life. Prior to this incident, Tad Cummins was married to the love of his life. He had met Jill Walters while attending Mt. Pleasant High School. The two soon fell in love. The high school sweethearts married July 20, 1985.

According to Tad, they were best friends. Even during financial hardship, the two supported each other and found a way to raise two beautiful daughters. Jill had been there through thick and thin. Looking back, Tad explains that he is "incredibly stupid and so undeserving of a woman like Jill." Together, he had it all. Now he lives everyday knowing that he destroyed the most beautiful aspect of his life: his relationship with Jill.

Tad Cummins also faces the real prospect of missing the funerals of both of his parents. As previously discussed, Tad's father was his hero. He was there to provide support, protection, and a model of a responsible man. Similarly, Tad Cummins loves his mother dearly. In many ways he was raised a *momma's boy*. He could always depend on her for love, comfort, and guidance. Unfortunately, his parents are 78 and 75 years old respectively. While he prays for their good health and longevity, he is burdened knowing that his own actions have almost guaranteed that he will not be able to pay proper respects if they pass during his incarceration.

13

Another significant collateral punishment is the loss of his employment opportunities. Tad Cummins worked in the medical field from 1992-2011. He primarily worked as a Respiratory Therapist for almost twenty years. In 2011, Tad Cummins accepted a position at Culleoka Unit School as a teacher. Both of these jobs required special licensing. As a result of this conviction, Tad Cummins has lost both licenses and any real prospects at future employment.

When a defendant suffers consequences for his conduct in addition to the sentence imposed through the criminal court process, such collateral punishment can be taken into account in fashioning an appropriate sentence. *See, e.g., United States v. Pressley*, 345 F.3d 1205, 1218-19 (11th Cir. 2003) (finding that district court had discretion to grant downward departure based on defendant having been on 23-hour-a-day lock-down during pre-trial confinement); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was already punished by the loss of his business as result of EPA-related charges). Courts have, for example, granted departures or variances where a defendant lost a prized job, his business, his good reputation, or even his marriage as a result of the criminal charges. *See Gaind*, 829 F. Supp. at 671; *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (finding variance appropriate where defendant was already collaterally punished by loss of his position, loss of his reputation, and the widespread media coverage of his case); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part

because defendant had lost good public sector job); *United States v. Stall*, 581 F.3d 276, 280 (6th Cir. 2009) (affirming downward variance based, in part, on fact that defendant's "fiancee [had] broke[n] off their engagement" as a result of the charges).

### C. Tad Cummins has Demonstrated Respect for the Law

Another consideration for the Court is respect for the law. Here, Tad Cummins exhibited respect for the law in numerous ways. For one, he entered a timely plea, wherein he expressed his genuine remorse. However, Tad Cummins also demonstrated respect for the law in another significant manner. When he was first arrested, he was interviewed by law enforcement. Tad Cummins waived his Constitutional right to an attorney and right to remain silent. During the interview, Tad Cummins admitted to all aspects of his activity. He admitted that he had taken measures to avoid detection, including disabling his GPS, obtaining alternate license plates, and throwing the cell phones over a bridge. Tad Cummins also described the attempt to enter Mexico via water. He further admitted that he had consensual sexual intercourse with M.T. (PSR 17-19). However, Tad Cummins went a step further with his cooperation with law enforcement. During the interview with law enforcement, Tad Cummins asked them to show M.T. a portion of his recorded statement, wherein he advised M.T. to tell the truth about what had happened. Previously, she denied that anything sexual had occurred between the two. However, after viewing his message asking that she be truthful, M.T. admitted the details of their relationship.

15

Had Tad Cummins not demonstrated this extraordinary level of cooperation, this case would have proceeded through the trial system causing additional pain for the minor, her family, Mr. Cummins' family, and the community at large. His admission and subsequent message that M.T. also tell the truth should be considered for a downward variance.

### D.     A Guidelines Punishment is an Effective Life Sentence

A Guidelines punishment in this case is essentially a prison death sentence for Tad Cummins. According to the U.S. Center for Disease Control and Prevention, a white male living in the United States has a life expectancy of 79 years. U.S. Center for Disease Control and Prevention, *National Vital Statistics Report*, Vol. 66, No. 4, Table 5 at p.17 (Aug. 2017).[1] However, in terms of a life sentence in prison, the analysis does not end there. The stress of prison has a significant impact on human life." As a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration." *United States v. Jenkins*, 854 F.3d 181, 186 (2d Cir. 2017) (citing Evelyn J. Patterson, *The Dose-Response of Time Served in Prison on Mortality:  New York State 1989-2003*, 103 Am. J. of Pub. Health 523, 526 (2013)).., The Bureau of Prisons treats a prisoner as if he or she is "10-15 years older than his or her chronological age" due in part to

---

[1] Available at: https://www.cdc.gov/nchs/data/nvsr/nvsr66/nvsr66_04.pdf.  Courts "[t]ypically . . . take judicial notice of [a party's] life expectancy." *Crane v. Crest Tankers*, 47 F.3d 292, 295 (8th Cir. 1995); *see, e.g., United States v. Jenkins*, 854 F.3d 181, 186 n.4 (2d Cir. 2017) (when reviewing a child-pornography sentence, calculating the defendant's life expectancy from the Center for Disease Control's life tables).

"stresses associated with incarceration." U.S. DOJ, *Aging Inmate Population, supra* at 2; *see United States v. Jenkins*, 854 F.3d 181, 186 (2d Cir. 2017).

Considering the above life statistics, Tad Cummins, if lucky, may live to be between the ages of 65 and 70 years of age in prison. He is currently 52 years old. Therefore, the recommendation of 30 years would most likely be a death sentence. Since the Federal system has abolished parole, a sentence of 30 years resembles a sentence of life without parole. "Life without parole sentences share some characteristics with death sentences that are not shared by other sentences*." Graham v. Florida*, 560 U.S. 48, 69 (2010). A sentence that denies the convict any "realistic opportunity to obtain release before the end of [its] term" thereby deprives "the convict of the most basic liberties without giving hope of restoration," and it "means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the convict, he will remain in prison for the rest of his days*." Id.* at 69-70, 82 (internal punctuation and citations omitted).

Such life sentences and effective life sentences should be reserved for murderers. "Serious non-homicide crimes may be devastating in their harm but in terms of moral depravity and of the injury to the person and to the public they cannot be compared to murder in their severity and irrevocability." *Graham*, 560 U.S. at 69 (internal punctuation and citations omitted). Thus, "defendants who do not kill, intend to kill, or

17

foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.*

The average sentence for murder is about 20 years and two months. U.S. Sentencing Commission, Quarterly Data Report at Table 6 (2016).[2] Indeed, even amongst those who commit murder, which the Supreme Court has observed is inherently the most serious of all crimes, only 21% receive a sentence of life. U.S. Sentencing Comm'n, *Life Sentences in the Federal System* [*Life Sentences*] at 5 (Feb. 2015).[3]

Here, Tad Cummins has accepted responsibility for Tad Cummins still did not murder anyone. Moreover, he has pled guilty, which is the type of behavior that typically supports a 30% reduction in a sentencing range under the Guidelines. The Court should, accordingly, grant him a sentence that is roughly 30% shorter than a sentence that would extend to his expected life span.

### E. Public Safety and Deterrence

Here, the Court must also consider public safety and deterrence when fashioning a just sentence. Tad Cummins understands this function of the Court and submits that a sentence in prison for 10 years would appropriately address such concern. While in prison, the public would be safe from any negative behavior in which he could engage.

---

2 Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_4th_16_Final.pdf
3 Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20150226_Life_Sentences.pdf.

Additionally, this is an isolated event, one for which Tad Cummins has expressed sincere remorse.

Age is certainly a factor that affects recidivism. When the Court evaluates public safety, recidivism is an appropriate consideration. All of the evidence indicates that the risk of sexual recidivism declines with age. Even for child molesters released after age sixty, the recidivism rate is very low (3.8%). *See* R. Karl Hanson, Recidivism and Age: Follow–Up Data From 4,673 Sexual Offenders, 17 J. Interpersonal Violence 1046, 1059 (2002). By the time Tad Cummins has served a decade in prison, he will be in his early sixties. He will be entering an age and a category where the likelihood of re-offense will be significantly diminished.

Tad Cummins is still grappling with the confusion surrounding the worst decision he has ever made. While he knows in his heart that this was a one-time, isolated event, Tad Cummins plans to participate in therapy and sex offender treatment made available to him both during and after prison. As discussed earlier, an aged Tad Cummins is much less likely to re-offend. He is even less likely to re-offend if he receives treatment in prison. *See*, e.g., Grant Duwe & Robin A. Goldman, The Impact of Prison-Based Treatment on Sex-Offender Recidivism: Evidence from Minnesota, Sexual Abuse: A Journal of Research and Treatment, vol. 21, No. 3 (September 2009) (confirming effectiveness of cognitive-behavioral treatment for sex offenders in prison setting) (attached as Exhibit 2). The majority of studies analyzing the effectiveness of sex

19

offender treatment have confirmed its benefits. Studies report that treated sex offenders have a sexual recidivism rate 37% lower than control groups receiving no treatment. Friedrich Losel & Martin Schmucker, The Effectiveness of Treatment for Sexual Offenders: A Comprehensive Meta-Analysis, JOURNAL OF EXPERIMENTAL CRIMINOLOGY, at pp. 127-28 (2005) (attached as Exhibit 3).

The United States Government, through the Bureau of Prisons (BOP), has a complete system set up to assist persons convicted of sexual crimes. The BOP Sex Offender Management Programs (SOMP) are designed to evaluate risk, provide specialized treatment, and provide transition services for an inmate when released back into the community. The BOP begins the treatment process with an in-depth evaluation. "SOMP Psychologists and Treatment Specialists perform specialized assessments of sexual offenders. These include risk assessments and diagnostic assessments." BOP Sex Offender Program Statement found at https://www.bop.gov/policy/progstat/5324_010.pdf (attached as Exhibit 4). The initial evaluation includes self-report history, medical records, and the PSR. The evaluation process seeks to determine the risk of sexual recidivism, treatment needs, and the need for a correctional management plan. "The Initial Risk Assessment is a provisional determination of risk used to guide treatment and management decisions. SOMP staff rely on actuarial risk assessment measures coupled with consideration of other clinically relevant factors associated with risk." (*Id*. at 8)

20

After an evaluation, the BOP considers all relevant factors and seeks to provide an effective treatment program. "The Bureau is committed to providing evidence-based psychology treatment programs to sexual offenders. Sex offender treatment programs, like all Bureau psychology treatment programs, are designed on the most recent research and evidence-based practices, ensuring effective treatment programs." (*Id* at 14).

The treatment plan is designed to address each inmate's needs and risks. According to the BOP, "treatment is most likely to be effective when the intensity of services is matched to the inmate's risk of sexual or criminal recidivism. Risk assessment will be conducted prior to placement into treatment to ensure the inmate receives a level of programming commensurate with his/her treatment needs." (*Id*. at 14) Therefore, the government's team of psychologist and treatment providers seek to use the most effective practices that have been tried and true. Similarly, the government's team will be versed on the latest treatment methods and the most effective means to address an inmate's specific needs. This type of treatment program will further reduce Tad Cummins' risk of re-offending, while also helping him to understand the psychological factors that led to his wrongful act.

Another component of the BOP's program is the Individualized Treatment Plan. "SOMP staff develop Individual Treatment Plans for each participant, considering risk and diagnostic factors. To assist participants in achieving their treatment goals, staff

21

select clinical interventions that are consistent with the concepts presented in the program journals." (*Id* at 15). As stated earlier, Tad Cummins plans to volunteer and sign up for all sex offender and psychological programs made available to him. An Individualized Treatment Plan, set up by the government's own team of psychologists and treatment providers is the exact type of treatment that would reduce Tad Cummins' risk of reoffending.

In addition to an Individualized Treatment Plan, BOP and government professionals monitor each participant's progress. "Treatment programs periodically evaluate participants' progress toward achieving treatment goals by ensuring that skills learned in treatment are practiced and generalized to various settings. Completion of treatment programs is based on a clinical assessment of the participant's success in the application of program concepts in his/her daily life." (*Id* at 15). Monitoring progress or lack thereof, allows government treatment providers to adjust the treatment plan to match the intensity of the participants' needs and risks.

The government's BOP treatment plan also targets criminogenic needs. "Treatment programs implement interventions that target criminogenic needs, such as offense-supporting beliefs, to reduce the likelihood of misconduct and recidivism. Treatment programs identify and target the criminogenic needs most directly linked to each inmate's offending behavior." (*Id* at 15). This effective tool allows psychologists to address nuanced beliefs or misunderstandings that a participant used to rationalize his

22

wrongful actions. By addressing these concerns head on, the BOP program is likely to be more effective, thus reducing Tad Cummins' risk of recidivism.

BOP also uses Cognitive Behavioral Therapy to assist participants. CBT is a solution-based model that can be used to address various destructive behaviors. The BOP has chosen this method because of its success rate in other inmate populations. (*Id.* at 15)

Understanding the treatment process, the BOP has developed three phases for treatment. Phase I is the orientation where participants develop basic cognitive-behavioral skills and begin to discuss their offense conduct in individual and group settings. *(Id* at 18). In Phase II, participants learn to apply the productive skills that they have been taught from government professionals. Phase II also monitors progress by determining whether a participant is self-disclosing in a manner that allows growth. While in Phase II, participants are placed into small Process Groups of no more than 12 participants. The smaller group permits a greater level of self-disclosure, in the interests of achieving full description of each participant's sexual offense conduct." *(Id* at 19). Phase III, also known as the Transition Phase, seeks to provide participants with various contextual opportunities to use the skills that they have learned in the previous phases.

Tad Cummins plans to take full advantage of every psychological and sexual offender program that is available to him. As discussed above, the BOP has a thorough program that has been developed and implemented by its team of government psychologists and treatment providers. The SOMP considers an offenders' self-disclosure, medical records, and PSR, to begin its analysis. The BOP then uses risk assessment and other factors to determine the level of intensity. After a thorough evaluation, participants are taught skills to change their destructive behavior. Tad Cummins will benefit from the BOP Sex Offender Management Program, which will significantly lower his recidivism rate.

Assuming Tad Cummins can live through his sentence, he will be under supervision for the rest of his life. That will certainly entail sex-offender counseling, as well as restrictions that ensure he has no unapproved access to minors. Those interventions, along with his age, will go far in ensuring that Tad Cummins will not recidivate.

### F.    A Sentence of 10 Years is Appropriate

Here, Tad Cummins has no criminal record. Furthermore, he accepted responsibility for his actions by pleading to every single count of the indictment instead of proceeding to trial, which would have created additional pain for the victim and her family. This should be contrasted against cases where a defendant was sentenced to 30

years after proceeding to trial. *United States v. Sanchez*, 440 F. App'x 436 (6th Cir. 2011) (reporting 30-year sentence for defendant who sexually abused his daughter from age 6 to 12; had prior conviction for molesting stepson; and was convicted at trial). *Doe v. Cotterman*, 2018 U.S. Dist. LEXIS 38794 (N.D. Ill. March 9, 2018) (recounting 35-year sentence for defendant who sexually abused girl from age 4 to 8 and was convicted at trial); *United States v. Dotson*, 715 F.3d 576 (6th Cir. 2013) (reporting 22-year sentence for defendant who sexually molested girlfriend's four-year-old daughter and was convicted at trial); *United States v. Levy*, 385 F. App'x 20 (2d Cir. 2010) (reporting 30-year sentence for defendant who sexually molested girlfriend's five-year-old daughter and was convicted at trial); *United States v. Street*, 531 F.3d 703 (8th Cir. 2008) (affirming 30-year sentence for defendant who molested daughter and step-daughter for years and was convicted at trial).

## 1. Collateral Consequences for a Registered Sex Offender

The Court may also consider, both for purposes of public safety and in considering an appropriate sentence, the significant collateral consequences of a sex offense conviction. If Tad Cummins survives this sentence, he will re-enter society forever branded with a label unique among convicted felons, a "sex offender," required by both state and federal law to register. It is, of course, Mr. Cummins' own behavior that has put him in this position, and he accepts that fact. But it is undeniable that life as a registered sex offender is measurably more compromised than life after a conviction

for any other type of offense. Sex offender registration is the scarlet letter of contemporary society.

Finding a residence will be particularly difficult for Tad Cummins. Initially, he planned to live with his parents. However, he has now found out that their property may be in a restricted zone. Leaving prison with no money, resources, or preplanned place to live, leaves Tad Cummins in a difficult position. He will likely struggle, as many sex offenders do, with finding adequate housing that satisfies the heavy restrictions on residency.

Employment will be hard to find, since Tad Cummins will now be labeled a sex offender. Not only has he lost all professional licenses, he forever will be known for this incident. With all of the media attention, it's hard to imagine any businesses in the area hiring Tad Cummins. Similarly, the supervision limitations on computer use and internet access further limit employment opportunities. The social stigma of registration all but ensures a lonely, isolated existence shrouded in shame.

The fact is that Tad Cummins, upon completing his prison sentence, will only have begun to taste the extent of his punishment. He will undergo mandatory restrictions, mandatory treatment, and a heavily monitored supervised release for the rest of his life.

**IV.     Conclusion**

Tad Cummins respectfully requests a sentence of 10 years. First and foremost, he has expressed his sincere remorse at the pain caused by his actions. On April 5, 2018, he stood before the Court and the world to accept responsibility for his actions. He is a son, a brother, and a father who has used his skills to help others. Tad Cummins also plans to be productive in the future. The associate chaplain at HCDC submits that Tad Cummins has "spent much time pondering and evaluating his offense, in an effort to understand why he did it, and to take measures to be sure that such an offense never happens again." (Exhibit 1e Chaplain Letter).

The chaplain also explains that Tad Cummins has been instrumental in helping others in jail. He states "I have counseled other inmates housed with Mr. Cummins, who have related to me just how much he has helped them in dealing with addictions and other dysfunctional behaviors. One man in particular has made tremendous changes in his attitude and understanding himself over the past few months, and gives Mr. Cummins much of the credit."

Tad Cummins hopes to make the best of this situation. He has acknowledged his actions and the ensuing pain he caused others. While he knows that he will serve time in federal prison, he remains optimistic that God is not through with him yet. He plans to take advantage of every course, program, and therapy so that he can still be of positive value to others.

27

This case is certainly serious. A young woman betrayed by her teacher is every parents' nightmare. However, Tad Cummins has accepted responsibility, expressed sincere remorse, and plans to improve himself every chance he gets. He has lived a life of 52 years as a law abiding citizen. More importantly, outside of this event, Tad Cummins has been a model citizen who has served others and given back to the community in numerous ways. He humbly requests that this Court consider all of the sentencing factors and order that he serve 120 months in the custody of the Bureau of Prisons.

Respectfully submitted,

s/ *Dumaka Shabazz*
DUMAKA SHABAZZ (BPR#022278)
Assistant Federal Public Defender
810 Broadway, Suite 200
Nashville, TN 37203
615-736-5047
E-mail: dumaka_shabazz@fd.org

Attorney for Tad Eric Cummins

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of January, 2019, I electronically filed the foregoing Sentencing Memorandum with the U.S. District Court Clerk by using the CM/ECF system, which will send a Notice of Electronic Filing to the following: Sara E. Myers and Philip H. Wehby, Assistant United States Attorneys, 110 Ninth Avenue South, Suite A-961, Nashville, Tennessee 37203-3870.

s/ *Dumaka Shabazz*
DUMAKA SHABAZZ